Exhibit 8

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

*CASE NO.: 2:24-cv-10049-MFL-CI*

JAMES MCDONALD,

Plaintiff,

vs

FJ CARRIER LOGISTICS LLC, a foreign corporation, DIESEL GLOBAL LOGISTICS INC., a foreign corporation, and MARCO POLO PASTRANA-JIMENEZ,

Defendants.

---

**A Report by Adam Grill**

**September 3, 2026**

---

Adam Grill
1236 Cordova St
Billings, MT 59101
(406) 248–2766

# I. INTRODUCTION

I, Adam Grill, have been contacted by Michigan Auto Law, P.C. to review information and offer opinions regarding the case matter of James McDonald vs FJ Carrier Logistics LLC, et al., as a result of a crash that occurred at approximately 7:00 AM on August 29, 2023 on eastbound Pennsylvania Road, 902 feet west of Canadian National Railway, Wayne County, Brownstown Township, Michigan.

At approximately that time and location, Mr. James McDonald was operating his motorcycle eastbound on Pennsylvania Road. Concurrently, Mr. Marco Polo Pastrana-Jimenez, was traveling westbound on Pennsylvania Road in his commercial motor vehicle, with his co-driver Mr. Omar Lima in the sleeper-berth. Mr. Pastrana-Jimenez failed to yield the right of way to Mr. McDonald and initiated a left turn into a private driveway directly into Mr. McDonald's path of travel.

## A. Background[1]

1. Location

   The event took place on eastbound Pennsylvania Road, 902 feet west of Canadian National Railway, Wayne County, Brownstown Township, Michigan.

2. Vehicle Status

   a. Unit 1: 2022 white Volvo operated by FJ Carrier Logistics LLC and their driver Mr. Marco Polo Pastrana-Jimenez.

   b. Unit 2: 2003 maroon Honda motorcycle, operated by Mr. James McDonald.

[1] Information taken from the State of Michigan Traffic Crash Report. Incident #: 23-15733. External #: 52182. ORI: MI8294700. File Class: 93001.

3. <u>Police Diagram:</u>




a.

4. <u>Police Synopsis:</u>

"*Unit 1 was traveling west on Pennsylvania Rd. Unit 2 was traveling east on Pennsylvania Rd. Unit 1 failed to yield the right of way when making a left turn onto a private drive, causing the crash between the two units.*"

## B. Scope

The purpose of this report is to present opinions in three overarching areas:

- General trucking industry customs, practices, and standards;
- The operating performance of Marco Polo Pastrana-Jimenez, the defendant commercial motor vehicle operator in this case;
- The motor carrier management responsibilities of FJ Carrier Logistics LLC, the defendant motor carrier involved in this case.

1. Definitions for the purpose of this report:

   a. <u>ACCIDENT AREA</u>, means the same as crash area and refers to the area on eastbound Pennsylvania Road, 902 feet west of Canadian National Railway, Wayne County, Brownstown Township, Michigan;

   b. <u>CDL</u>, refers to a commercial driver license;

   c. <u>CDL Manual</u>, refers to the American Association of Motor Vehicle Administrators (AAMVA) Model Commercial Drivers' License Manual, and includes the CDL manuals from all states, including Michigan;

   d. <u>CMV</u>, unless specified otherwise, refers to a commercial motor vehicle;

   e. <u>CMV OPERATOR</u>, refers to the driver of a commercial motor vehicle;

   f. <u>DRIVER</u>, unless specifically described otherwise, refers to a CMV operator;

   g. <u>FHWA</u>, refers to Federal Highway Administration, from which Congress separated FMCSA in 1999;

   h. <u>FJ CARRIER LOGISTICS</u>, refers to FJ Carrier Logistics LLC (USDOT # 3162922, MC # 112466), a defendant motor carrier in this case;

   i. <u>FMCSA</u>, refers to the U.S. Department of Transportation's Federal Motor Carrier Safety Administration;

j. FMCSR, means Federal Motor Carrier Safety Regulations.[2]

2. This report presents specific information pertaining to:

   a. Regulations and standard practices of professional drivers and motor carriers.

   b. The responsibility of professional drivers to operate their vehicles in a safe and prudent manner, including (but not limited) by:

      i. Making safe and reasonable decisions without endangering other road users;

      ii. Operating a CMV in a defensive manner with consideration for the rights and safety of others;

      iii. Managing space while driving;

      iv. Proper accident avoidance and mitigation.

   c. The operating performance of Defendant Pastrana-Jimenez just before and at the time of the collision.

   d. The motor carrier safety management responsibilities of FJ Carrier Logistics as it relates to this case and Defendant Pastrana-Jimenez.

3. Schedule of Appendices:

   a. Appendix A – CV of Adam Grill.

   b. Appendix B – Examination of material and information by Adam Grill in connection with the formation of opinions stated in this report.[3]

---

[2] The FMCSRs appear in Title 49 C.F.R., Chapter III, Subpart B.
[3] This material includes information and publications from readily available sources including the internet, The American Trucking Association, The Michigan CDL Manual, and the Federal Motor Carrier Safety Regulations.

## C. Opinions based on experience, training, education, and background

Raised in a family environment that centered on truck driving and truck driver training, I have worked around large commercial vehicles and studied the intricacies of commercial vehicle transportation among the best in the industry. I received my certification as a commercial vehicle operator in 2005. I hold a CDL with endorsements for hazardous materials, tankers, double trailers, triple trailers, passenger buses, and school buses. I am a certified director of safety (CDS). I am certified for forklift operation, operation of longer combination vehicles (LCVs), crane hoist and rigging, aerial manlift, telehandler, and heavy equipment including payloaders and motor graders. I am a certified pilot car operator and flagger through Gulf Coast Community College in Panama City, Florida.

For eight years I served in the US Army and US Army National Guard where I was called upon to teach truck and heavy vehicle operation and driver safety, among other duties. I am currently an active truck driver, and an associate of Atlantic Pacific Resource Group. I have formal truck driver training and education from Sage Technical Services, MTS Freight, the United States Army, the Montana Army National Guard, The National Safety Council, the Smith System Driver Improvement Institute, and others.

My family experience and lifestyle have always centered on the instruction and operation of heavy equipment and tractor-trailers. I currently serve as a trucking consultant and manage the fleet for Lew Grill Specialized Services. I have also assisted in over a dozen special studies and trucking projects covering safety procedures as well as time and motion studies including visibility from CMV drivers' point-of-view, starting/stopping, turning, and various other aspects of safe and efficient trucking operation. I have worked in various capacities as a teacher, including classroom instructor, off-road driving range instructor, and on-road skills instructor.

I have over 15 years of combined experience as a truck driver, forklift operator, heavy equipment operator, industrial machinery operator, truck-driving instructor, dock supervisor, truck-driving consultant, and accident investigator. I am a member of the Transportation Research Board of the National Academies, Owner-Operator Independent Drivers Association, Truckload Carrier's Association, Montana Contractor's Association, National Private Truck Council, Montana Motor Carrier's Association, and the American Trucking Association. I have participated in educational training at the American Trucking Associations Technology and Maintenance Council. I worked on a project for the Federal Motor Carrier Safety Administration relating to the testing protocol for Electronic Logging Devices (ELDs) as required under the proposed rulemaking.

My current focuses include training and supervision of truck drivers, training instructors, and warehousing staff, fleet management for Lew Grill Specialized Services and The Legacy International Corporation, freight hauling and truck/trailer transportation, truck and driver dispatching, special projects for various fleet, industry, and government entities, and the development of educational programs for commercial drivers, equipment operators, and industry professionals, as well as supervisor for the motor carrier and broker relationships involving Atlantic Pacific Resource Group and The Legacy International Corporation with outside brokers, shippers, motor carriers, and others.

I have experience in truck accident investigation, vehicle dynamics, and accident reconstruction from the Legacy Corporation. I have testified in litigation matters where I have qualified as an expert concerning safe operation of commercial motor vehicles and the standard of care of commercial vehicle operators and motor carriers. I have operated a commercial motor vehicle for the furtherance of interstate commerce in AL, AZ, AR, CA, CO, CT, DC, DE, FL, GA, ID, IL, IN, IA, KS, KY, LA, ME, MD, MA, MI, MN, MS, MO, MT, NE, NV, NH, NJ, NM, NY, NC, ND, OH, OK, OR, PA, RI, SC, SD, TN, TX, UT, VT, VA, WA, WV, WI, WY.

## II. TRUCKING INDUSTRY RULES, REGULATIONS, STANDARDS, CUSTOMS, AND PRACTICES.

### A. Standard customs and practices in the trucking industry.

The totality of trucking industry customs and practices is based upon the combined experiences of "stake holders" who are industry experts in their particular occupation, that share a common interest for highway safety. These are the type of resources relied upon within the industry which I, and similarly qualified experts, would use from day to day for purposes of safety and training. Included are truck drivers, owner-operators, motor carriers, risk managers, trade organizations, government, insurance companies, manufacturers, industry suppliers, and training providers and their instructors, to mention a few. All play an important role in the development of operating standards, training materials and their delivery to sensitize and educate CMV operators. This educational material includes, but is not limited to, publications and material produced by motor carrier industry sources, for example, the:

- American Trucking Associations (ATA);
- National Safety Council (NSC);
- The Smith System for Safe Driving;

- American Transportation Research Institute (ATRI) publications;
- State Trucking Associations;
- North American Transportation Research Institute (NATMI);
- Notice of Proposed Rulemaking for FMCSRs;
- American National Standards Institute (ANSI);
- Truckload Carrier Association (TCA);
- USDOT; and,
- Many others.

### B. The standard of care of truck drivers.

The standard of care for truck drivers is the same as for every road user, in the respect that the truck must be operated in a reasonably safe manner that avoids crashing into things, or having others collide with it. In my opinion, the performance standards to accomplish this standard of care are much different for truck drivers than operators of smaller vehicles.

Their distinctive position as CMV operators is due to the very nature of their work, the additional training and licensing required, and the special characteristics of their vehicles, as described subsequently in this report. CMVs are the largest vehicles on the highway. Their height, size, and weight disparity compared to non-commercial vehicles creates a greater risk to the occupants of non-commercial vehicles when they are involved together in the same mishap.

### C. The need for CMV regulations and standards.

While all road users are subject to government regulations and driving standards, drivers and commercial motor carriers who operate large CMVs have more stringent requirements concerning their requirements for the reasonably safe operation of their vehicles. When it comes to highway safety, these more stringent requirements apply because of the very nature of their work, and the special characteristics of their vehicles. These characteristics require additional care in driver selection, training, management, and supervision to assure safe operations are achieved and maintained. The need is often set forth in a notice of proposed rulemaking by the various governmental agencies involved in regulating the industry.

### D. CMVs require a higher degree of safe driving performances.

All CMVs are more complicated and less stable than non-CMVs, making them more difficult to operate. In comparison to non-commercial vehicles, their design characteristics, control instruments, and mechanical systems require special knowledge, skills, and driving behaviors in order to drive them safely, legally, and efficiently. A partial list of differences includes that large trucks:

1. Are bigger and heavier than other vehicles;
2. Are more difficult to maneuver;
3. Are more complex to drive;
4. Must be inspected more frequently;
5. Take longer to accelerate and to stop;
6. Have complex vehicle systems and more individual components;
7. Entail special knowledge and skills to operate and maintain;
8. Require a special driver's license, certification, and qualification;
9. Have more and different regulations to obey;
10. Require more alertness and caution, and greater driver performance duties in order to achieve the same standard of care as other road users;
11. Have different energy absorbing systems that are often mismatched with smaller vehicles; and,
12. Have significant mass/weight differences.

Motor carriers and drivers who operate CMVs are required to know and obey a much broader and more stringent series of state and federal regulations than those who operate non-commercial vehicles. CMV operators operate enormously more hours and more miles than non-CMV drivers do. It is common for CMV drivers to spend ten times the amount of time behind-the-wheel than other drivers. Therefore, they and their equipment must be prepared to safely handle a much greater number of hazards and stressful situations.

## E. Federal Motor Carrier Safety Regulations (FMCSR).

The FMCSRs are applicable to all employers, employees, and commercial motor vehicles, which transport property or passengers in interstate commerce. Motor carriers, including officers, agents, representatives, employees, and drivers, or those who are responsible for hiring, assigning, training, supervising, maintaining, dispatching, or driving trucks, have a statutory responsibility to be instructed in, and comply with Federal Motor Carrier Safety Regulations.[4] Moreover, the federal regulations require that all drivers of commercial motor vehicles shall have knowledge and skills necessary to operate a commercial motor vehicle safely.[5]

## F. USDOT/FHWA Minimum Performance Standards for Truck Drivers.

The Truck Driver Model Curriculum, as it is known in the industry, is a broad set of standardized minimum core curriculum guidelines and training materials. In the 1980's, the U.S. Department of Transportation's, Federal Highway Administration (FHWA) determined that a need existed to propose minimum training standards for tractor-trailer drivers. To provide technical guidance, the FHWA developed a model curriculum that could be used for training them. The curriculum incorporated the FMCSR and addressed the critical aspects of truck driver performance standards. It identifies the specific knowledge, skills, and attitudes necessary for truck drivers to perform their work in a safe, legal, and efficient manner.[6]

## G. Commercial Driver's License Standards.

Established under the Commercial Motor Vehicle Safety Act of 1986 (CMVSA), the CDL requirements are intended to improve highway safety by requiring commercial vehicle drivers to pass a series of knowledge and skills tests that are directly related to the special handling characteristics for the type of vehicles they drive. To that end, the CMVSA directed the FHWA[7] to develop national minimum licensing standards, which all CMV drivers must meet in order to obtain a CDL. The existing USDOT/FHWA Model Curriculum was used to develop the CDL written and driving skills tests that were implemented as licensing standards in 1992 and remain as the commercial drivers' licensing standards in use today.

---

[4] FMCSR § 392.1.
[5] FMCSR § 383.3. See also §§ 383.110, 383.111, and Appendix to Subpart G – sample guidelines for required knowledge and skills.
[6] Model Curriculum: Minimum Standards for Training Tractor-Trailer Drivers, USDOT/FHWA, 1985, GPO Stock No. 050–001–00293–1.
[7] Congress created FMCSA as separate from FHWA in 1999 to assume these responsibilities.

1. "*All drivers of commercial motor vehicles shall have knowledge and skills necessary to operate a commercial motor vehicle safely*"[8] as contained in the FMCSRs. To that end all states publish CDL manuals for commercial driver license applicants in their states. These requirements "*apply to every person who operates a commercial motor vehicle (CMV) in interstate, foreign, or intrastate commerce, to all employers of such persons, and to all States.*"[9]

2. It is for this reason that the CDL manual in every state, including Michigan, is substantively uniform to those published by all other states, and it contains the general knowledge, and describes the required knowledge and skills for truck drivers.

3. The CDL Manual contains the information that truck drivers should know and consider when operating a CMV, including the requirements concerning managing space, keeping a proper lookout, and accident avoidance and mitigation – to name a few.

### H. Defensive Driving Standards.

As identified previously in this report, all commercial motor vehicles require a higher degree of driving performance in order to operate reasonably and safely. Simply put, what is reasonable for the properly qualified and trained CMV driver is substantially different from what is reasonable for the non-CMV licensed driver of a regular passenger car, truck, or SUV. Many defensive driver programs have become widely accepted and well-known educational resources for motor carriers to train, educate, and evaluate commercial drivers. It is paramount that motor carriers take advantage of these defensive driving standards. Some of the defensive driving program sources include the National Safety Council (NSC), The Smith System Driver Improvement Institute of America, and J.J. Keller to name a few.

### I. Strategy of Safe Driving.

The strategy of safe driving is achieved through the development and improvement of five mental driving skills: searching, identifying, predicting, deciding, and executing.[10]

a. Searching the driving environment.
b. Identifying the hazardous driving condition or situation.

---

[8] FMCSR § 383.3 Applicability, and §§ 383.110, 383.111, and Appendix to Subpart G— sample guidelines for required knowledge and skills.
[9] Id. at § 383.3.
[10] This driver perception process is commonly abbreviated as SIPDE and is a recognized defensive driving process similar to the Smith System 5 Keys and the information promulgated throughout the state CDL manuals.

c. Predicting the probable sequence of the hazard.
d. Deciding on what maneuver is required to avoid the hazard.
e. Executing the required maneuver.

## J. Gatekeepers to highway safety.

1. Motor carriers who allow drivers to operate commercial trucks have specific requirements and Safety Management Controls required by the FMCSRs and industry standards, including:

    a. Driver qualifications;
    b. Vehicle inspection and maintenance procedures and records;
    c. Driver compliance with controlled substances and alcohol testing;
    d. Driver compliance with driver hours of service, including company and driver's ability to plan trips to conform with speed limits and regulations;
    e. The company's compliance with federal, state, county, and local regulations utilizing the Safety Management Cycle that complies with the recommendations of the FMCSA for reasonably safe motor carriers.

2. Motor carriers and their drivers who operate CMVs are required to know and obey a much broader and more stringent series of rules and regulations. The increased exposure of risk and danger to the environment and general public increases their responsibilities and performance duties to maintain that same standard of care proportionate to the risks involved.

3. Because of the complex variables associated with their driving environment, their equipment, and the amount of time spent on the highway, recklessness, or carelessness of a CMV operator is likely to result in a catastrophic crash or event. Therefore, it is critical that CMV operators like Defendant Pastrana-Jimenez have advanced knowledge and skill, safe driving attitudes, are physically and medically fit, are alert to safely do their work proportionate to the greater degree of risk they are exposed to and can fulfill the higher degree of safety performance required of them as professional truck drivers. These higher performance standards are essential to highway safety and can only be derived from proper driver selection, supervision, regulatory obedience, driver monitoring, driver training, and experience.

## III. OPINIONS REGARDING THE MOTOR CARRIER MANAGEMENT RESPONSIBILITIES OF FJ CARRIER LOGISTICS.

### A. FJ Carrier Logistics had a regulatory responsibility to ensure that their driver, like Mr. Pastrana-Jimenez, met their obligations under the Federal Motor Carrier Safety Regulations.

1. FMCSR §390.3 – General applicability.

    a. "*(e) Knowledge of and compliance with the regulations. (1) Every employer shall be knowledgeable of and comply with all regulations contained in this subchapter that are applicable to that motor carrier's operations. (2) Every driver and employee involved in motor carrier operations shall be instructed regarding, and shall comply with, all applicable regulations contained in this subchapter.*"

2. FMCSR §390.11 – Motor carrier to require observance of driver regulations.

    a. "*Whenever in part 325 of subchapter A or in this subchapter a duty is prescribed for a driver or a prohibition is imposed upon the driver, it shall be the duty of the motor carrier to require observance of such duty or prohibition. If the motor carrier is a driver, the driver shall likewise be bound.*"

3. FMCSR §392.2 – Applicable operating rules.

    a. "*Every commercial motor vehicle must be operated in accordance with the laws, ordinances, and regulations of the jurisdiction in which it is being operated. However, if a regulation of the Federal Motor Carrier Safety Administration imposes a higher standard of care than that law, ordinance or regulation, the Federal Motor Carrier Safety Administration regulation must be complied with.*"

**B. FJ Carrier Logistics had a responsibility to deploy successful safety management systems that would effectively prevent such a collision from occurring.**

1. FMCSR §385.3 – Definitions and acronyms.

   a. "*Safety management controls means the systems, policies, programs, practices, and procedures used by a motor carrier to ensure compliance with applicable safety and hazardous materials regulations which ensure the safe movement of products and passengers through the transportation system, and to reduce the risk of highway accidents and hazardous materials incidents resulting in fatalities, injuries, and property damage.*"

2. In order to receive for-hire operating authority, like the interstate operating authority granted to FJ Carrier Logistics,[11] a motor carrier like FJ Carrier Logistics must complete a form OP-1 application, which requires them to certify as follows:

   a. "*Applicant has access to and is familiar with all applicable USDOT regulations relating to the safe operation of commercial vehicles and the safe transportation of hazardous materials and will comply with these regulations.*"

   b. "*In so certifying, applicant is verifying that, at a minimum, it:*

      (1) *Has in place a system and an individual responsible for ensuring overall compliance with FMCSRs.*

      (2) *Can produce a copy of the FMCSRs and the Hazardous Materials Transportation Regulations.*

      (3) *Has in place a driver safety training/orientation program.*

      (4) *Has prepared and maintains an accident register (49 CFR 390.15).*

      (5) *Is familiar with DOT regulations governing driver qualifications and has in place a system for overseeing driver qualification requirements (49 CFR 391).*

---

[11] https://li-public.fmcsa.dot.gov/LIVIEW/pkg_carrquery.prc_authorityhistory.

(6) *Has in place policies and procedures consistent with USDOT regulations governing driving and operational safety of motor vehicles, including drivers' hours of service and vehicle inspection, repair, and maintenance (49 CFR 392, 395, and 396).*

(7) *Is familiar with and will have in place on the appropriate effective date, a system for complying with USDOT regulations governing alcohol and controlled substances testing requirements (49 CFR 382 and 40).*"

3. FJ Carrier Logistics would have ultimately signed the Form OP-1 swearing the following oath:

   a. "*I, _________, verify under penalty of perjury, under the laws of the United States of America, that all information supplied on this form or relating to this application is true and correct. Further, I certify that I am qualified and authorized to file this application. I know that willful misstatements or omissions of material facts constitute Federal criminal violations punishable under 18 USC 1001 by imprisonment up to 5 years and fines up to $10,000 for each offense. Additionally, these misstatements are punishable as perjury under 18 USC 1621, which provides for fines up to $2,000 or imprisonment up to 5 years for each offense. I further certify under penalty of perjury, under the laws of the United States, that I have not been convicted, after September 1, 1989, of any Federal or State offense involving the distribution or possession of a controlled substance, or that if I have been so convicted, I am not ineligible to receive Federal benefits, either by court order or operation of law, pursuant to Section 5301 of the Anti-Drug Abuse Act of 1988 (21 USC 862).*"

4. **OPINION:** This means that FJ Carrier Logistics is the one responsible for ensuring proper compliance with the Federal Motor Carrier Safety Regulations; including having a program in place for effectively training their drivers.

5. "*Safety must be considered as an essential element in the operation of every motor fleet, regardless of size, type, or function. … Motor fleets that do not have effective safety or loss prevention programs place themselves in positions of financial jeopardy, regulatory crisis, and social irresponsibility.*"[12]

---

[12] North American Transportation Management Institute. "Safety, A Management Function." Motor Fleet Safety Supervision: Principles and Practices, Eighth Edition, Denver, CO, NATMI, 2019, p. 1. (NATMI is a professional development organization for transportation industry professionals. NATMI offers professional training courses throughout North America for truck, bus and transit fleet professionals in the areas of fleet safety, fleet maintenance management, transportation security, and accident investigation.)

6. Supervisors, managers, and persons within a company that are responsible for protecting the company's assets and investments, including profit, play a key role in the function of highway safety.

   a. "*Safety programs should be considered on another basis – as a social necessity of a motor fleet. In addition to showing concern for the well-being of its employees, the socially conscious motor fleet industry recognizes that it has moral and social responsibilities toward the public with whom it engages on a regular basis.*"[13]

7. According to the ATRI Studies on Predicting Truck Crash Involvement:

   a. "*Each of the carriers emphasized during the interview process that proactive safety measures, such as initial and "sustainment" training, are the lynchpins to ensuring that negative safety incidents do not occur in the first place. The value of these safety programs, however, must be complemented by remedial safety training programs that mitigate a problem driver behavior after a negative safety incident has occurred.*"[14]

   b. "*All of the safety directors emphasized the need to keep safety "constantly in front of the drivers." To do that, all of the carriers had a continuous "sustainment" training program. These programs blended standard safety training activities with company-specific strategies (that were derived from company safety data such as crash and conviction types).*"[15]

      (1) **OPINION:** In order to have a successful sustainment training program, a motor carrier must take a three-phase approach to the training: 1) Educate drivers on a subject; 2) Show drivers what the company's expectations are through practical hands-on experiences; and 3) Assess or test drivers to ensure that they meet, and believe in, the qualifications and standards you've set forth.

---

[13] North American Transportation Management Institute. "Safety, A Management Function." Motor Fleet Safety Supervision: Principles and Practices, Eighth Edition, Denver, CO, NATMI, 2019, p. 1.
[14] Predicting Truck Crash Involvement, 2011 Update, page 24.
[15] Id., page 25.

c. "*The carriers interviewed routinely performed employee performance reviews at regularly scheduled intervals, almost always more frequently than the federally required annual driver motor vehicle record (MVR) review. Several of the carriers reported using these reports to look for potential trends or patterns of behavior in order to effectively monitor and, if necessary, take corrective measures to improve the driver's safety performance.*"[16]

d. "*Similarly, the Crash Predictor serves as a resource for motor carriers, providing critical guidance on targeted risk-reduction training for incoming drivers, as well as targeted remedial training opportunities for veteran drivers.*"[17]

### C. FJ Carrier Logistics failed to comply with their own policies and procedures regarding hiring.

1. In their Hiring Standards, it states: "*We require driver applicants to be a minimum of 23 years of age and have a minimum of 2 years of verifiable tractor-trailer driving experience within the United States and/or Mexico in similar CMVs.*"[18]

   a. **OPINION:** Nothing in the discovery produced to date confirms FJ Carrier Logistics requested and obtained safety performance history from the employers listed on the application submitted by Defendant Pastrana-Jimenez, nor that they verified he had the required experience.

2. Deposition testimony of Hazel Beccerra:

   a. Pages 13-14: "***Q:** When you were responsible for hiring drivers at that time, was there a certain hiring process or procedure that you had to follow at FJ? **A:** Yes. **Q:** All right. And what was that process or their criteria that needed to be followed for FJ and their new hires? **A:** Firstly, the operator has to send their license and their medical card, which is international, so that they can be able to be within the United States. Then you send that off to the insurance to check that the operator is suitable to drive in the United States. Then you follow the rest of the protocol. **Q:** When you say the rest of the protocol, what does that protocol consist of? **A:** That they fill out the entire application, that is, the operators, for them to take the driving test, for them to do all the internal tests that we have so that we can approve them as good operators. **Q:** Does FJ provide a road test to the new drivers? **A:** Yes. In – like an operator that we have who*

---

[16] Id.
[17] Id., 2018 Update, page 40.
[18] FJ Carrier Logistics Safety Policy Manual & CMV Driver Handbook, page 59.

*specialized in that.* ***Q:*** *Would they complete documentation or paperwork for that road test?* ***A:*** *Yes.* ***Q:*** *Would that go in some type of driver qualification file?* ***A:*** *I don't understand the question.* ***Q:*** *Do you know what a driver qualification file is?* ***A:*** *No.*"

**D. FJ Carrier Logistics failed to adequately monitor their drivers' activities.**

1. Deposition testimony of Hazel Beccerra:

   a. Pages 17-19: "***Q:*** *When you say you were responsible for monitoring drivers, what did that include?* ***A:*** *We – we check their cameras. We check the cameras and the trucks.* ***Q:*** *Would you monitor any logs?* ***A:*** *Those are the service hours.* ***Q:*** *Would you monitor any telematic data?* ***A:*** *I don't understand.* ***Q:*** *Do you know what telematics are?* ***A:*** *Might you be referring to GPS?* ***Q:*** *Yes. Are you familiar with that?* ***A:*** *Yes.* ***Q****: And is that one of the things you do to monitor drivers – is monitor their GPS?* ***A:*** *No.* ***Q:*** *Is there anyone at FJ that does that?* ***A:*** *Yes.* ***Q:*** *Who?* ***A:*** *I don't know.* ***Q:*** *Then how do you know someone does it?* ***A:*** *Because I have to do the checks, so, like, I know it exists, but I don't know who does it.* ***Q:*** *Does FJ get alerts if there's some type of violation of a driver, such as speeding or maybe a hard braking event?* ***A:*** *Yes.* ***Q:*** *Do you monitor that at all?* ***A:*** *Yes.* ***Q:*** *Does anyone else monitor that besides you?* ***A:*** *Yes.* ***Q:*** *Who else?* ***A:*** *Three people.* ***Q:*** *Who are those people?* ***A:*** *My team from Mexico.* ***Q:*** *Who is that?* ***A:*** *O Dalis.* ***Q:*** *Okay. Who else?* ***A:*** *Janet and Fernanda.*"

      (1) **OPINION:** FJ Carrier Logistics failed to effectively monitor the hours of service records. Had they done so, they would have identified Defendant Pastrana-Jimenez operating their commercial motor vehicle while logged in under the name of his co-driver Omar Lima Zavaleta.

   b. Pages 20-23: "***Q:*** *To be clear, you aren't actively monitoring the drivers; you monitor the people who monitor the drivers. Is that correct?* ***A:*** *Correct.* ***Q:*** *When you were referring to approximately thirty to fifty drivers, is that for each of those three people?* ***A:*** *Yes.* ***Q:*** *If one of the people monitoring the drivers has some type of alert about that driver, what are they supposed to do?* ***A:*** *What kind of alert would it be?* ***Q:*** *For example, a speeding alert.* ***A:*** *We have to call them on the phone to be able to know what's going on.* ***Q:*** *Is it your testimony whenever there's a speeding alert, that someone from FJ Carrier calls the driver?* ***A:*** *Can you repeat the – the question for me. I'm sorry.* ***Q:*** *If there is an alert for speeding, does someone at FJ Carrier always call the driver to see why they are speeding?* ***A:*** *Yes, of course. We have to*

*check on it when they get it.* ***Q:*** *If a driver continues – let me ask – I apologize. I'll restart. If a driver has a speeding alert and someone at FJ Carrier calls them, do they warn them not to continue to speed?* ***A:*** *Of course.* ***Q:*** *If the driver continues to speed, does anyone at FJ Carrier do anything?* ***A:*** *Yes. We have to – we give them a warning.* ***Q:*** *If they speed again, what do you do?* ***A:*** *At the third warning they're fired.* ***Q:*** *Is that speeding based upon each time there's an alert of speeding?* ***A:*** *I don't understand the question.* ***Q:*** *Can a driver have multiple speeding alerts and therefore receive multiple warnings on one trip?* ***A:*** *It's very rare, because normally after the first time that we warn them, they don't do it again, but still we write in the warning.* ***Q:*** *Can a driver get multiple warnings for one trip?* ***A:*** *Yes.* ***Q:*** *If a driver had three warnings during one trip, would they be fired?* ***A:*** *Of course, because it's dangerous.* ***Q:*** *A warning is given to a driver after each time a speeding alert comes up; is that correct?* ***A:*** *No, I didn't understand the question.* ***Q:*** *The monitoring that is done, that's where a employee at FJ Carrier received an alert that the driver is speeding; true?* ***A:*** *Yes.* ***Q:*** *After that speeding alert, then they are called and given a warning; true?* ***A:*** *True.* ***Q:*** *If a driver receives three speeding alerts, that driver should be fired?* ***A:*** *Yes.* ***Q:*** *That is the policy of FJ Carrier Logistics; true?* ***A:*** *Can you repeat the question for me.* ***Q:*** *That is policy at FJ Carrier Logistics; true?* ***A:*** *Can you repeat the question for me.* ***Q:*** *The decision to fire a driver after three speeding warnings is the policy of FJ Carrier Logistics?* ***A:*** *Yes.* ***Q:*** *That policy to fire a driver after three speeding warnings was in place at the time of the collision on August 29, 2023?* ***A:*** *I don't remember.* ***Q:*** *Do you have any reason to believe that that policy was not in place at the time of the collision?* ***A:*** *Can you repeat the question for me.* ***Q:*** *Do you have any reason to believe that that policy was not in place at the time of the collision?* ***A:*** *No.*"

2. Deposition testimony of Omar Lima Zavaleta:

   a. Pages 17-18: "***Q:*** *When you would drive at FJ the first time, do they track your speeds?* ***A:*** *Yes.* ***Q:*** *How did they do that?* ***A:*** *Through the camera.* ***Q:*** *When you would drive that first time at FJ, would you get alerts on the screen at all if you were speeding?* ***A:*** *Yes.* ***Q:*** *Was that system called Monarch?* ***A:*** *Yes.* ***Q:*** *If you received an alert, would someone at FJ call you as well?* ***A:*** *No.* ***Q:*** *When you would complete a trip and you had alerts, would anyone talk to you after that trip? You can answer, sir.* ***A:*** *Yes.* ***Q:*** *And who would do that?* ***A:*** *Safety.* ***Q:*** *Were you ever given a talk about any violations or alerts that were received while driving at FJ? You can answer, sir.* ***A:*** *No.* ***Q:*** *Did you ever receive any written warnings regarding any alerts from any Monarch alerts, such as speeding from FJ? You can answer.* ***A:*** *No. No.*"

3.

Sat Aug 26, 2023

| Time | Driver | Ignition | In-Cab Alert | Max Speed | Avg Speed | Inst Speed | Speed Limit | Max Accel | Max Decel | Distance | Odometer | Voltage | Run Time | Latitude | Longitude | Location |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 00:01:32 | Lima Zavaleta, Omar *2847* | On | | 72 mph | 71 mph | 71 mph SW | 70 mph | 0.018 g | 0.017 g | 0.0 mi. | 442,567.1 | 13.98v | 729,895 min | 31.67920 | -86.75488 | I-65, Greenville, AL |
| 00:03:32 | Lima Zavaleta, Omar *2847* | On | | 71 mph | 71 mph | 71 mph SW | 70 mph | 0.017 g | 0.019 g | 2.3 mi. | 442,569.4 | 13.95v | 729,897 min | 31.65023 | -86.77604 | I-65, Georgiana, AL |
| 00:05:32 | Lima Zavaleta, | On | | 72 mph | 71 mph | 70 mph SW | 70 mph | 0.032 g | 0.016 g | 4.7 mi. | 442,571.8 | 13.95v | 729,899 min | 31.62442 | -86.80219 | I-65, Georgiana, AL |
| 01:21:34 | Lima Zavaleta, Omar *2847* | On | | 78 mph | 73 mph | 71 mph SW | 70 mph | 0.055 g | 0.030 g | 94.3 mi. | 442,661.4 | 13.98v | 729,975 min | 30.90218 | -88.00575 | I-65, Creola, AL |
| 05:49:43 | Lima Zavaleta, Omar *2847* | On | | 72 mph | 69 mph | 67 mph SW | 60 mph | 0.045 g | 0.080 g | 364.0 mi. | 442,931.1 | 13.95v | 730,244 min | 30.26331 | -92.00669 | I-10, Lafayette, LA |

4.

Sun Aug 27, 2023

| Time | Driver | Ignition | In-Cab Alert | Max Speed | Avg Speed | Inst Speed | Speed Limit | Max Accel | Max Decel | Distance | Odometer | Voltage | Run Time | Latitude | Longitude | Location |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01:10:20 | Lima Zavaleta, Omar *2847* | On | | 73 mph | 70 mph | 73 mph N | 70 mph | 0.034 g | 0.037 g | 81.5 mi. | 443,915.4 | 13.89v | 732,839 min | 30.50506 | -97.68415 | I-35, Round Rock, TX |
| 01:50:21 | Lima Zavaleta, Omar *2847* | On | | 72 mph | 69 mph | 72 mph E | 65 mph | 0.040 g | 0.041 g | 128.4 mi. | 443,962.3 | 13.92v | 732,879 min | 31.09058 | -97.38675 | I-35, Temple, TX |
| 11:36:41 | Lima Zavaleta, Omar *2847* | On | | 73 mph | 71 mph | 71 mph NE | 65 mph | 0.029 g | 0.030 g | 569.4 mi. | 444,403.3 | 13.89v | 733,465 min | 34.66593 | -92.39194 | I-30, Little Rock, AR |

5.

Tue Aug 29, 2023

| Time | Driver | Ignition | In-Cab Alert | Max Speed | Avg Speed | Inst Speed | Speed Limit | Max Accel | Max Decel | Distance | Odometer | Voltage | Run Time | Latitude | Longitude | Location |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 03:57:13 | Lima Zavaleta, Omar 2847 | On | | 67 mph | 50 mph | 57 mph NE | 50 mph | 0.049 g | 0.159 g | 3.6 mi. | 445,134.6 | 13.95v | 734,445 min | 41.08886 | -84.98433 | US-24, New Haven, IN |
| 03:59:13 | Lima Zavaleta, Omar 2847 | On | | 72 mph | 69 mph | 71 mph E | 65 mph | 0.040 g | 0.026 g | 6.0 mi. | 445,137.0 | 14.01v | 734,447 min | 41.10819 | -84.94981 | US-24, New Haven, IN |
| 04:01:13 | Lima Zavaleta, Omar 2847 | On | | 72 mph | 71 mph | 71 mph NE | 65 mph | 0.027 g | 0.027 g | 8.3 mi. | 445,139.3 | 13.95v | 734,449 min | 41.12029 | -84.90793 | US-24, Woodburn, IN |
| 04:03:13 | Lima Zavaleta, Omar 2847 | On | | 72 mph | 71 mph | 71 mph NE | 65 mph | 0.040 g | 0.038 g | 10.7 mi. | 445,141.7 | 13.98v | 734,451 min | 41.13566 | -84.87254 | US-24, Woodburn, IN |
| 04:05:13 | Lima Zavaleta, Omar 2847 | On | | 71 mph | 71 mph | 71 mph E | 65 mph | 0.027 g | 0.032 g | 13.1 mi. | 445,144.1 | 14.01v | 734,453 min | 41.14967 | -84.83125 | US-24, Woodburn, IN |
| 04:07:13 | Lima Zavaleta, Omar 2847 | On | | 72 mph | 71 mph | 71 mph NE | 65 mph | 0.027 g | 0.023 g | 15.5 mi. | 445,146.5 | 14.01v | 734,455 min | 41.15892 | -84.78805 | US-24, Antwerp, OH |
| 04:09:13 | Lima Zavaleta, Omar 2847 | On | | 73 mph | 71 mph | 71 mph E | 65 mph | 0.030 g | 0.024 g | 17.9 mi. | 445,148.9 | 14.01v | 734,457 min | 41.16808 | -84.74516 | US-24, Antwerp, OH |
| 04:11:13 | Lima Zavaleta, Omar 2847 | On | | 72 mph | 71 mph | 71 mph NE | 65 mph | 0.014 g | 0.016 g | 20.2 mi. | 445,151.2 | 14.01v | 734,459 min | 41.18127 | -84.70501 | US-24, Antwerp, OH |
| 04:13:13 | Lima Zavaleta, Omar 2847 | On | | 71 mph | 71 mph | 71 mph E | 65 mph | 0.026 g | 0.022 g | 22.6 mi. | 445,153.6 | 13.98v | 734,461 min | 41.19945 | -84.66758 | US-24, Antwerp, OH |
| 04:15:14 | Lima Zavaleta, Omar 2847 | On | | 71 mph | 71 mph | 71 mph E | 65 mph | 0.018 g | 0.016 g | 25.0 mi. | 445,156.0 | 14.01v | 734,463 min | 41.21075 | -84.62462 | 11084 US-24, Cecil, OH |
| 04:17:14 | Lima Zavaleta, Omar 2847 | On | | 73 mph | 71 mph | 71 mph E | 65 mph | 0.030 g | 0.030 g | 27.4 mi. | 445,158.4 | 14.01v | 734,465 min | 41.21970 | -84.58188 | US-24, Cecil, OH |
| 04:19:14 | Lima Zavaleta, Omar 2847 | On | | 73 mph | 71 mph | 71 mph E | 65 mph | 0.028 g | 0.035 g | 29.8 mi. | 445,160.8 | 14.01v | 734,467 min | 41.23357 | -84.54363 | 13298 US-24, Cecil, OH |
| 04:21:14 | Lima Zavaleta, Omar 2847 | On | | 71 mph | 71 mph | 71 mph E | 65 mph | 0.018 g | 0.015 g | 32.1 mi. | 445,163.1 | 13.98v | 734,469 min | 41.24490 | -84.50075 | 13592 US-24, Cecil, OH |
| 04:23:14 | Lima Zavaleta, Omar 2847 | On | | 71 mph | 71 mph | 71 mph E | 65 mph | 0.014 g | 0.026 g | 34.5 mi. | 445,165.5 | 14.01v | 734,471 min | 41.25628 | -84.45782 | US-24, Defiance, OH |
| 04:25:14 | Lima Zavaleta, Omar 2847 | On | | 72 mph | 71 mph | 67 mph NE | 65 mph | 0.028 g | 0.026 g | 36.9 mi. | 445,167.9 | 14.01v | 734,473 min | 41.27272 | -84.41952 | US-24, Defiance, OH |
| 04:27:14 | Lima Zavaleta, Omar 2847 | On | | 73 mph | 71 mph | 71 mph NE | 65 mph | 0.030 g | 0.028 g | 39.3 mi. | 445,170.3 | 14.01v | 734,475 min | 41.29564 | -84.38597 | US-24, Defiance, OH |
| 04:29:14 | Lima Zavaleta, Omar 2847 | On | | 71 mph | 71 mph | 71 mph E | 65 mph | 0.027 g | 0.030 g | 41.7 mi. | 445,172.7 | 14.01v | 734,477 min | 41.30817 | -84.34598 | US-24, Defiance, OH |
| 04:31:14 | Lima Zavaleta, Omar 2847 | On | | 71 mph | 71 mph | 71 mph NE | 65 mph | 0.016 g | 0.015 g | 44.1 mi. | 445,175.1 | 13.98v | 734,479 min | 41.32138 | -84.30566 | US-24, Defiance, OH |
| 04:33:14 | Lima Zavaleta, Omar 2847 | On | | 71 mph | 71 mph | 71 mph NE | 65 mph | 0.016 g | 0.015 g | 46.4 mi. | 445,177.4 | 14.01v | 734,481 min | 41.33945 | -84.26708 | US-24, Defiance, OH |
| 04:35:14 | Lima Zavaleta, Omar 2847 | On | | 72 mph | 71 mph | 71 mph NE | 65 mph | 0.031 g | 0.029 g | 48.8 mi. | 445,179.8 | 14.07v | 734,483 min | 41.35627 | -84.22766 | US-24, Defiance, OH |
| 04:37:14 | Lima Zavaleta, Omar 2847 | On | | 71 mph | 71 mph | 71 mph NE | 65 mph | 0.013 g | 0.015 g | 51.2 mi. | 445,182.2 | 14.04v | 734,485 min | 41.37371 | -84.18835 | 16947 US-24, Napoleon, OH |
| 04:39:14 | Lima Zavaleta, Omar 2847 | On | | 71 mph | 71 mph | 71 mph NE | 70 mph | 0.016 g | 0.028 g | 53.6 mi. | 445,184.6 | 14.01v | 734,487 min | 41.39366 | -84.15157 | US-24, Napoleon, OH |

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 04:41:14 | Lima Zavaleta, Omar *2847* | On | 73 mph | 71 mph | 71 mph E | 70 mph | 0.044 g | 0.031 g | 56.0 mi. | 445,187.0 | 14.01v | 734,489 min | 41.41248 | -84.11491 | US-24, Napoleon, OH |
| 04:43:14 | Lima Zavaleta, Omar *2847* | On | 72 mph | 71 mph | 71 mph E | 70 mph | 0.023 g | 0.022 g | 58.3 mi. | 445,189.3 | 14.01v | 734,491 min | 41.41669 | -84.06999 | 12007 US-24, Napoleon, OH |
| 04:45:15 | Lima Zavaleta, Omar *2847* | On | 73 mph | 71 mph | 72 mph NE | 70 mph | 0.031 g | 0.023 g | 60.7 mi. | 445,191.7 | 14.01v | 734,494 min | 41.42209 | -84.02664 | US-24, Liberty Center, OH |
| 04:47:15 | Lima Zavaleta, Omar *2847* | On | 71 mph | 71 mph | 71 mph E | 70 mph | 0.016 g | 0.026 g | 63.1 mi. | 445,194.1 | 14.01v | 734,496 min | 41.43059 | -83.98397 | US-24, Liberty Center, OH |
| 04:49:15 | Lima Zavaleta, Omar *2847* | On | 71 mph | 71 mph | 71 mph E | 70 mph | 0.031 g | 0.017 g | 65.5 mi. | 445,196.5 | 14.07v | 734,498 min | 41.43308 | -83.93868 | US-24, Liberty Center, OH |
| 04:51:15 | Lima Zavaleta, Omar *2847* | On | 72 mph | 71 mph | 71 mph E | 70 mph | 0.027 g | 0.023 g | 67.9 mi. | 445,198.9 | 14.04v | 734,500 min | 41.42979 | -83.89437 | US-24, Liberty Center, OH |
| 04:53:15 | Lima Zavaleta, Omar *2847* | On | 72 mph | 71 mph | 71 mph E | 70 mph | 0.028 g | 0.024 g | 70.2 mi. | 445,201.2 | 14.01v | 734,502 min | 41.43963 | -83.85097 | US-24, Grand Rapids, OH |
| 04:55:15 | Lima Zavaleta, Omar *2847* | On | 71 mph | 71 mph | 71 mph E | 70 mph | 0.015 g | 0.026 g | 72.6 mi. | 445,203.6 | 14.04v | 734,504 min | 41.45582 | -83.81510 | US-24, Grand Rapids, OH |
| 04:57:15 | Lima Zavaleta, Omar *2847* | On | 71 mph | 71 mph | 70 mph NE | 70 mph | 0.030 g | 0.026 g | 75.0 mi. | 445,206.0 | 14.04v | 734,506 min | 41.46960 | -83.77719 | US-24, Waterville, OH |
| 04:59:15 | Lima Zavaleta, Omar *2847* | On | 72 mph | 71 mph | 71 mph NE | 70 mph | 0.029 g | 0.028 g | 77.4 mi. | 445,208.4 | 14.04v | 734,508 min | 41.50039 | -83.75987 | US-24, Waterville, OH |
| 05:01:15 | Lima Zavaleta, Omar *2847* | On | 72 mph | 71 mph | 71 mph E | 65 mph | 0.028 g | 0.028 g | 79.8 mi. | 445,210.8 | 14.04v | 734,510 min | 41.52453 | -83.73101 | US-24, Waterville, OH |
| 05:03:15 | Lima Zavaleta, Omar *2847* | On | 73 mph | 70 mph | 70 mph NE | 65 mph | 0.056 g | 0.083 g | 82.1 mi. | 445,213.1 | 14.01v | 734,512 min | 41.54507 | -83.69774 | US-24, Maumee, OH |
| 05:05:15 | Lima Zavaleta, Omar *2847* | On | 71 mph | 46 mph | 41 mph N | 65 mph | 0.057 g | 0.200 g | 83.7 mi. | 445,214.7 | 13.92v | 734,514 min | 41.55821 | -83.68783 | US-23, Maumee, OH |
| 05:07:15 | Lima Zavaleta, Omar *2847* | On | 72 mph | 66 mph | 70 mph N | 65 mph | 0.052 g | 0.014 g | 85.9 mi. | 445,216.9 | 13.95v | 734,516 min | 41.58984 | -83.69140 | US-23, Maumee, OH |
| 05:09:15 | Lima Zavaleta, Omar *2847* | On | 73 mph | 70 mph | 69 mph N | 65 mph | 0.037 g | 0.078 g | 88.2 mi. | 445,219.2 | 14.01v | 734,518 min | 41.62382 | -83.69267 | US-23, Holland, OH |
| 05:11:15 | Lima Zavaleta, Omar *2847* | On | 72 mph | 70 mph | 71 mph N | 65 mph | 0.032 g | 0.039 g | 90.6 mi. | 445,221.6 | 14.01v | 734,520 min | 41.65771 | -83.69477 | US-23, Toledo, OH |
| 05:13:16 | Lima Zavaleta, Omar *2847* | On | 72 mph | 67 mph | 69 mph E | 65 mph | 0.052 g | 0.076 g | 92.9 mi. | 445,223.9 | 14.01v | 734,522 min | 41.68788 | -83.68875 | I-475, Toledo, OH |
| 05:15:16 | Lima Zavaleta, Omar *2847* | On | 73 mph | 72 mph | 70 mph E | 65 mph | 0.038 g | 0.045 g | 95.3 mi. | 445,226.3 | 14.01v | 734,524 min | 41.68800 | -83.64357 | I-475, Toledo, OH |
| 05:17:16 | Lima Zavaleta, Omar *2847* | On | 70 mph | 65 mph | 62 mph SE | 60 mph | 0.037 g | 0.066 g | 97.4 mi. | 445,228.4 | 14.01v | 734,526 min | 41.68453 | -83.60249 | I-475, Toledo, OH |
| 05:19:16 | Lima Zavaleta, Omar *2847* | On | 73 mph | 66 mph | 68 mph NE | 60 mph | 0.074 g | 0.094 g | 99.7 mi. | 445,230.7 | 13.98v | 734,528 min | 41.68344 | -83.56945 | I-75, Toledo, OH |
| 05:21:16 | Lima Zavaleta, Omar *2847* | On | 72 mph | 67 mph | 70 mph E | 65 mph | 0.055 g | 0.100 g | 101.9 mi. | 445,232.9 | 13.92v | 734,530 min | 41.68962 | -83.52968 | I-75, Toledo, OH |
| 05:23:16 | Lima Zavaleta, Omar *2847* | On | 73 mph | 71 mph | 71 mph N | 60 mph | 0.036 g | 0.042 g | 104.3 mi. | 445,235.3 | 13.98v | 734,532 min | 41.70718 | -83.50174 | I-75, Toledo, OH |
| 05:25:16 | Lima Zavaleta, Omar *2847* | On | 72 mph | 71 mph | 71 mph N | 65 mph | 0.030 g | 0.024 g | 106.7 mi. | 445,237.7 | 14.01v | 734,534 min | 41.73729 | -83.48732 | I-75, Erie, MI |
| 05:27:16 | Lima Zavaleta, Omar *2847* | On | 72 mph | 71 mph | 71 mph N | 70 mph | 0.015 g | 0.023 g | 109.1 mi. | 445,240.1 | 14.01v | 734,536 min | 41.77092 | -83.47999 | I-75, Erie, MI |
| 05:29:16 | Lima Zavaleta, Omar *2847* | On | 73 mph | 69 mph | 64 mph NE | 70 mph | 0.038 g | 0.063 g | 111.4 mi. | 445,242.4 | 14.01v | 734,538 min | 41.80012 | -83.45773 | I-75, Erie, MI |
| 05:31:16 | Lima Zavaleta, Omar *2847* | On | 70 mph | 64 mph | 64 mph NE | 70 mph | 0.041 g | 0.071 g | 113.6 mi. | 445,244.6 | 13.98v | 734,540 min | 41.82525 | -83.43415 | I-75, Luna Pier, MI |
| 05:33:16 | Lima Zavaleta, Omar *2847* | On | 72 mph | 67 mph | 70 mph NE | 70 mph | 0.060 g | 0.118 g | 115.8 mi. | 445,246.8 | 14.01v | 734,542 min | 41.85351 | -83.41309 | I-75, La Salle, MI |
| 05:35:16 | Lima | On | 72 mph | 70 | 71 mph | 70 mph | 0.055 | 0.043 | 118.1 mi. | 445,249.1 | 14.01v | 734,544 | 41.88248 | -83.39010 | I-75, Monroe, MI |

6. **OPINION:** Nothing in the testimony of Omar Lima Zavaleta confirms that FJ Carrier Logistics utilized the monitoring system they had available to effectively monitor, discipline, or retrain their drivers in the event of non-compliance with hours-of-service regulations or speed limits. During the days prior to the collision in this matter, FJ Carrier Logistics received notification of multiple speeding violations yet Omar Lima Zavaleta testified he did not receive calls regarding them. Given the testimony as well as the written evidence[19] there were three progressive disciplinary actions available, with the final action being termination, yet the policy was not complied with.

### E. FJ Carrier Logistics failed to adequately monitor their drivers' on road activities.

1. Deposition testimony of Hazel Beccerra:

    a. Page 39: "***Q:*** *Do you play any role in monitoring the SMS data, including BASIC scores, for FJ Carrier?* ***A:*** *I – I'm still not understanding a question. I'm sorry.* ***Q:*** *Do you know what SMS data is?* ***A:*** *Yes.* ***Q:*** *Do you ever monitor that for FJ Carrier?* ***A:*** *No.* ***Q:*** *Who at FJ does?* ***A:*** *I don't know.*"

2. Deposition testimony of Elias Salinas:

    a. Page 40: "***Q:*** *Okay. All right. Do you monitor the basic scores of FJ?* ***A:*** *No, sir.* ***Q:*** *Is there anyone at FJ that does?* ***A:*** *The safety manager.* ***Q:*** *And – and who is that again?* ***A:*** *Currently Miss Hazel Beccerra.* ***Q:*** *And would that have been Hazel at the time of the collision as well?* ***A:*** *Can you repeat the question?* ***Q:*** *Yes. You said Hazel's the one that monitors the basic scores at FJ, correct?* ***A:*** *Yes.* ***Q:*** *Okay. Would that have been her responsibilities back at the time of the collision as well?* ***A:*** *No, sir.* ***Q:*** *Okay. Who would have been that responsibility at the time of the collision?* ***A:*** *Marco Morales.*"

3. Deposition testimony of Marco Morales:

    a. Pages 36-37: "***Q:*** *Would you review any SMS data for FJ Carrier?* ***A:*** *No.* ***Q:*** *Do you know what that is?* ***A:*** *They're the messages.*"

---

[19] Id., page 20.

4. Deposition testimony of Eric Serna:

   a. Pages 53-54: "***Q:*** *So your safety department would have been the ones to look at the portal then; is that correct?* ***A:*** *That's correct.* ***Q:*** *And you said you've reviewed FJ Carrier's scores when you've looked online; is that correct?* ***A:*** *Like I mentioned, if you go into the website without logging in, you do not see this information.* ***Q:*** *Okay. Have you ever seen this information before?* ***A:*** *No.* ***Q:*** *Do you know what BASIC scores are?* ***A:*** *Honestly, no.*"

5. The Safety Measurement System of the FMCSA organizes roadside safety performance data into seven Behavior Analysis and Safety Improvement Categories (BASICs) – Unsafe Driving, Crash Indicator, Hours-of-Service (HOS) Compliance, Vehicle Maintenance, Controlled Substances/Alcohol, Hazardous Materials (HM) Compliance, and Driver Fitness.

6. A carrier which has an alert ⚠ symbol is at or above the threshold in a BASIC or has one or more Acute/Critical Violations in a BASIC and is prioritized for interventions or further monitoring.[20]

7. **OPINION:** FJ Carrier Logistics has been frequently in alert status in four of seven FMCSA Safety BASICs. This means their violation percentile in a specific BASIC is higher than the established intervention threshold compared to motor carriers of the same size.

8. During the period of August 2022 through September 29, 2023, FJ Carrier Logistics was in alert status in the Driver Fitness BASIC due to violations found during roadside inspections:

9. During the following time periods FJ Carrier Logistics was in alert status for violations related to Hours of Service:

   a. May 2023.

10. During the following time periods FJ Carrier Logistics was in alert status for violations found related to their Vehicle Maintenance:

    a. August 2022 to April 2023.

[20] https://csa.fmcsa.dot.gov/Documents/SMS-Display-Key-Terms-Glossary.pdf

11. During the following time periods FJ Carrier Logistics was in alert status in the Crash Indicator category during the periods of:

    a. April 2023, May 2023, and September 2023.

12. **OPINION:** FJ Carrier Logistics failed to improve their safety scores through monitoring, training, retraining, or complying with their policies and procedures related to the safe and defensive operation of their commercial motor vehicles. This lack of proactive responsive resulted in frequent intervention alert status. While a reader should not draw a conclusion about a company's overall safety fitness based on this data, it is important to consider in conjunction with the letter from the FMCSA dated December 11, 2020 regarding the notification of a safety audit and the carrier's significant non-compliance in the area of Driver Fitness. It is evident that FJ Carrier Logistics' lack of an effective safety management system contributed to the unsafe driving acts of their driver as it relates to this crash.

## F. FJ Carrier Logistics failed to train and communicate their policies and expectations regarding left turns and intersections.

1. Intersections produced more fatal crashes than entrance/exit ramps.

    a. "*Crashes often occur at intersections because these are the locations where two or more roads cross each other and activities such as turning left, crossing over, and turning right have the potential for conflicts resulting in crashes.*"[21]

2. Since the 1970's, UPS, one of the largest carriers in the United States, implemented a policy of reducing the number of left-turns their drivers make while driving.[22]

3. Uber has also implemented a road safety policy by reducing the number of left-turns in its in-app navigation routing. [23]

    a. "*Anyone who drives knows the challenges of making a left turn, especially in a busy city. According to the National Highway Traffic Safety Administration (NHTSA), 22% of crashes involve a vehicle making a left turn at an intersection. We've now improved our in-app navigation to suggest fewer left turns. With just a few minor adjustments to GPS routing that have little to no impact on trip time, drivers who use Uber's in-app navigation can enjoy a less stressful driving experience.*"

---

[21] Crash Factors in Intersection-Related Crashes: An On-Scene Perspective, NHTSA (2010).
[22] "Why UPS trucks (almost) never turn left", CNN (2017).
[23] "Only on Uber: safety in the driver's seat", http://uber.com/newsroom/safety-in-the-drivers-seat/ (2022).

b. "*According to NHTSA, a quarter of traffic fatalities and about half of all traffic injuries occur at intersections, and in 2018 alone there were morethan6,700 fatalities involving intersections without signals. When a driver using Uber's in-app navigation is approaching an intersection without a four-way stop, the app will now highlight this on the map screen with a message reminding them to "watch for cross traffic.*"

4. Schneider has extensive policies related to left-turns.

a.

**Understanding how long it takes to turn left**




First and foremost, it is important for drivers to make sure they have enough time before making a left turn. While driving a semi, it takes 16 seconds just to make the turn and 10 seconds more to get up to 35 mph. Make sure the gap between you and oncoming vehicles is big enough to turn safely; don't try to force others to slow down or stop for you.

One of the most important things to practice before and during a left turn is patience. Sometimes there will be obstacles that prohibit drivers from immediately making a turn. If there is a car in the path of the tractor, the driver must wait to turn until the car moves.

b.

**The 5 S's of successfully making a left turn**

At Schneider, we are instructing our drivers to follow the '5 S's' while turning left. They include:

1. **Set up**
   - Are you in the correct lane? If not, get there.
2. **Signal**
   - This is not optional. Turn on your signal at least 100 feet before the turn.
3. **Slow down**
   - Ideally, the turn should not be taken faster than 10-15 mph. If your container is top-heavy, it should be closer to 10.
4. **Survey**
   - This is the most important step. Drivers need to remember to look near and far. Double check at night and be extra careful by looking for smaller vehicles like motorcycles. Anticipate that other traffic may be exceeding the speed limit, which reduces closing time.
   - Other things drivers need to ask themselves while surveying: *Is this a buttonhook turn? Is this the correct road? Are there signs (lane signs, caution signs, 'No Truck' signs, low clearances, etc.)? What is traffic doing before and after the turn? Is the traffic light green? Can I see around the turn? Are there lanes blocked around the corner?*
5. **Steer**
   - ... into and through the turn.

[24]

---

[24] https://schneiderjobs.com/blog/turn-left-with-tractor-trailer.

5. Deposition testimony of Hazel Beccerra:

    a. Page 26: "***Q:*** *Did he undergo any training when he was hired?* ***A:*** *Yes.* ***Q:*** *What training did he undergo?* ***A:*** *Service hours.* ***Q:*** *Anything else?* ***A:*** *I don't remember.* ***Q:*** *Did Mr. Pastrana undergo any training by FJ Carrier Logistics on how to safely operate a commercial motor vehicle?* ***A:*** *No.*"

    b. Page 28: "***Q:*** *Why don't you provide a copy of the Federal Motor Carrier Safety Regulations to your drivers?* ***A:*** *Because it's a very lengthy book.*"

    c. Page 30: "***Q:*** *When you hire new drivers, would you give them any type of safety manual?* ***A:*** *I don't remember.* ***Q:*** *Do drivers have to sign off receiving any type of driving manual?* ***A:*** *Now they do.* ***Q:*** *When did that start?* ***A:*** *I don't remember.*"

6. Deposition testimony of Elias Salinas:

    a. Page 163: "***Q:*** *How long is the orientation?* ***A:*** *I do not know. I think it's – I know it's a few hours, but I don't know exactly.* ***Q:*** *Okay. All right. It sounds like it's less – less than one day; fair?* ***A:*** *I would assume so, yeah.*"

    b. Page 171: "***Q:*** *Okay. And I think you said – I apologize if I asked you this. You didn't do any of, like, the training or orientation with the drivers, correct?* ***A:*** *That is correct, sir.* ***Q:*** *Okay. That would have been, at the time of the collision, Marco, is that correct?* ***A:*** *Yes, sir.*"[25]

7. Deposition testimony of Marco Morales:

    a. Pages 38-39: "***Q:*** *Do you know what training drivers get when they are hired?* ***A:*** *No. Like, they do tests and all, but I don't know exactly what it is.* ***Q:*** *You're not involved in that; correct?* ***A:*** *No.*"

8. **OPINION:** Nothing in the testimony or the discovery reviewed to date provides any positive indication of actual training being conducted or steps undertaken by FJ Carrier Logistics. This lack of oversight is a deviation from the standards expected of a safe and reasonable carrier, as further expressed through the FMCSA's Safety Management Cycle outlined below.

[25] Marco Morales.

9. The Safety Management cycle was developed by the FMCSA as a tool for both investigators and motor carriers to identify and pinpoint specific areas of deficiency, as well as how to best correct those areas.[26]

10. The Safety Management Cycle also serves as a good system for motor carriers to base their motor carrier management practices around, instead of just relying on it to address specific areas of concern.

11. The SMC can be used to address a specific BASICs category, but generally the SMC consists of six cyclical steps:[27]

    a. Policies and procedures;

    b. Roles and responsibilities;

    c. Qualification and hiring;

    d. Training and communication;

    e. Monitoring and tracking;

    f. Meaningful action.

12. "*By periodically reviewing each process, there is an opportunity to identify and correct breakdowns in SMPs before safety and compliance issues are identified or crashes occur. The SMC can also be used after safety and compliance issues or crashes have taken place to assist in determining which SMPs need attention.*"[28]

---

[26] See Appendix D to this report.
[27] Id.
[28] Id.




*The Safety Management Cycle, or SMC, consists of the six Safety Management Processes outlined in the graphic above.*

13.

14. A breakdown in one or more of these cyclical steps will cause a breakdown in the safety management for the motor carrier, and ultimately have a negative impact on a desired safety culture.

15. The SMC is a critical tool in the development and maintenance of a safe and responsible fleet. This tool is readily available from the Federal Motor Carrier Safety Administration and encompasses the duties expressed throughout this report.

16. **OPINION:** In this case, there is a notable breakdown in step 4 as it relates to left turns and yielding the right of way.

17. **OPINION:** FJ Carrier Logistics failed to utilize the tools readily available to them and monitor the speed and hours of service of Defendant Pastrana-Jimenez and Omar Lima as noted elsewhere in this report.

## IV. OPINIONS REGARDING THE CMV OPERATING PERFORMANCE OF DEFENDANT PASTRANA-JIMENEZ.

### A. Defendant Pastrana-Jimenez knew, or should have known, all of the information in the CDL Manual that is expected of any well-trained, prudent, safe, defensive CMV operator. Including:

1. FMCSR § 383.111 – Required Knowledge.
   a. "*(a) All CMV operators must have knowledge of the following 20 general areas:* ***(1) Safe operations regulations.*** *Driver-related elements of the regulations contained in parts 391, 392, 393, 395, 396 and 397 of this subchapter, such as: … (ii) Procedures for safe vehicle operations; … (****7) Visual search.*** *The importance of proper visual search, and proper visual search methods, including: (i) Seeing ahead and to the side;…* ***(10) Space management.*** *The procedures and techniques for controlling the space around the vehicle, including: (i) The importance of space management; (ii) Space cushions, e.g., controlling space ahead/to the rear; …* ***(13) Hazard perceptions****. The basic information on hazard perception and clues for recognition of hazards, including: (i) Road characteristics; and (ii) Road user activities. …*"
      (1) **OPINION:** This required knowledge, which Defendant Pastrana-Jimenez knew or should have known, means that Defendant Pastrana-Jimenez has different and unique performance objectives when operating a CMV, including greater anticipation than operators of non-CMVs to avoid becoming involved in a collision.
      (2) **OPINION:** This required knowledge is also outlined and explained in the Michigan CDL Manual. Further, the information in the Michigan CDL Manual is substantively similar to the safety concepts taught in the Smith System's 5 Keys to Safe Driving as well as other industry resources as cited throughout this report.

### B. Defendant Pastrana-Jimenez had a responsibility to apply industry defensive driving concepts like The Smith System.

1. The Smith System [29] consists of five critical keys:
   a. Aim High In Steering.
      (1) Look far ahead into the area you're approaching;

[29] The Smith System is a very well-known defensive driving program and is a standard in industries that operate vehicles for the furtherance of a business.

(2) Extend your forward visibility according to your speed, using at least a 15 second eye lead time.

b. Get The Big Picture.

(1) Maintain a 360-degree circle of constant awareness;

(2) Position yourself so that you can see all around you;

(3) Prioritize what areas around you will require more attention;

(4) Getting the big picture allows you to anticipate the actions of others, and helps you allow for relevant traffic variables.

c. Keep Your Eyes Moving.

(1) Keep your eyes moving in order to continuously get the big picture;

(2) Scanning skills become much more important when there is traffic, pedestrians, potential hazards, or difficult maneuvers.

d. Leave Yourself An Out.

(1) Leave space around your vehicle for increased visibility and a way out of trouble;

(2) Constantly evaluate your traffic position;

(3) A space cushion gives you an escape route and reduces your vulnerability to the actions of other drivers.

e. Make Sure They See You.

(1) Get eye contact;

(2) Communicate early so that if others don't heed then you have time to give yourself an out.

2. According to The Smith System, following these five keys accomplishes three objectives:

a. Creates space for the vehicle – Allows the driver to be less vulnerable to driving errors from others or from oneself.

b. Gains Visibility for the driver – Allows the driver to gather crucial traffic information in order to make safe, reasonable, and prudent driving decisions.

c. Provides time to make decisions – Allows the driver to think, react, and retain space around the vehicle.

### C. Defendant Pastrana-Jimenez had a responsibility to keep a proper lookout in order to perceive hazards around him.[30]

1. Michigan CDL Manual, Section 2.4 – Seeing.[31]
   a. "*To be a safe driver you need to know what's going on all around your vehicle. Not looking properly is a major cause of accidents.*"
2. Michigan CDL Manual, Section 2.4.1 – Seeing Ahead.[32]
   a. "*All drivers look ahead; but many don't look far enough ahead. **Importance of Looking Far Enough Ahead.** Because stopping or changing lanes can take a lot of distance, knowing what the traffic is doing on all sides of you is very important. You need to look well ahead to make sure you have room to make these moves safely.*"
   b. "***How far Ahead to Look.** Most good drivers look at least 12 to 15 seconds ahead. That means looking ahead the distance you will travel in 12 to 15 seconds. At lower speeds, that's about one block. At highway speeds it's about a quarter of a mile. If you're not looking that far ahead, you may have to stop too quickly or make quick lane changes. Looking 12 to 15 seconds ahead doesn't mean not paying attention to things that are closer. Good drivers shift their attention back and forth, near and far.*"
   c. "***Look for Traffic.** Look for vehicles coming onto the highway, into your lane, or turning. Watch for brake lights from slowing vehicles. By seeing these things far enough ahead, you can change your speed, or change lanes if necessary to avoid a problem. If a traffic light has been green for a long time, it will probably change before you get there. Start slowing down and be ready to stop.*"
3. **OPINION:** These safety rules are echoed in the Smith System's defensive driving concepts of aiming high in steering, getting the big picture, and keeping your eyes moving.

---

[30] Sources listed below are based on the regulatory concept found in FMCSR §383.111 – Required Knowledge. "*(7) Visual Search. The importance of proper visual search, and proper visual search methods …*"
[31] **See also:** J. J. Keller. "Visual Search." *Entry-Level Driver Training: Obtaining A CDL*, Neenah, Wisconsin, J. J. Keller & Associates, 2019, p. 126. **See also:** Adams, Alice, and PTDI. "Visual Search." *Tractor-Trailer Truck Driver Training*, Fourth Edition, Clifton Park, NY, Delmar Cengage Learning, 2013, pp. 334–339. **See also:** Mike Byrnes and Associates. "Safe Driving." *Bumper to Bumper: The Complete Guide to Tractor-Trailer Operations*, Fifth Edition, Corpus Christi, Texas, Mike Byrnes & Associates, 2013, pp. 244–245.
[32] Id.

**D. Defendant Pastrana-Jimenez had a responsibility to adhere to industry safe driving standards and practices as it relates to space management.[33]**

1. Michigan CDL Manual, Section 2.7 – Managing Space.[34]

    a. "*To be a safe driver, you need space all around your vehicle. When things go wrong, space gives you time to think and to take action.*"

    b. "*To have space available when something goes wrong, you need to manage space. While this is true for all drivers, it is very important for large vehicles. They take up more space and they require more space for stopping and turning.*"

2. Michigan CDL Manual, Section 2.7.7 – Space Needed to Cross or Enter Traffic.[35]

    a. "*Be aware of the size and weight of your vehicle when you cross or enter traffic. Here are some important things to keep in mind.*"

    b. "*Because of slow acceleration and the space large vehicles require, you may need a much larger gap to enter traffic than you would in a car.*"

    c. "*Acceleration varies with the load. Allow more room if your vehicle is heavily loaded.*"

    d. "*Before you start across a road, make sure you can get all the way across before traffic reaches you.*"

**E. Defendant Pastrana-Jimenez had a responsibility to properly recognize, prepare for, and respond to the hazards around him.[36]**

1. Michigan CDL Manual, Section 2.8.1 – Importance of Seeing Hazards.[37]

    a. "***What is a Hazard?*** *A hazard is any road condition or other road user (driver, bicyclist, pedestrian) that is a possible danger.*"

---

[33] Sources listed below are based on the regulatory concept found in FMCSR §383.111 – Required Knowledge. "*(9) Speed Management. The importance of understanding the effects of speed … (10) Space Management. The procedures and techniques for controlling the space around the vehicle…*"

[34] **See also:** J. J. Keller. "Space Management." *Entry-Level Driver Training: Obtaining A CDL*, Neenah, Wisconsin, J. J. Keller & Associates, 2019, p. 162. **See also:** Adams, Alice, and PTDI. "Space Management." *Tractor-Trailer Truck Driver Training*, Fourth Edition, Clifton Park, NY, Delmar Cengage Learning, 2013, pp. 352–355. **See also:** Mike Byrnes and Associates. "Safe Driving." *Bumper to Bumper: The Complete Guide to Tractor-Trailer Operations*, Fifth Edition, Corpus Christi, Texas, Mike Byrnes & Associates, 2013, pp. 251–252.

[35] Id.

[36] Sources listed below are based on the regulatory concept found in FMCSR §383.111 – Required Knowledge. "*(13) Hazard perceptions. The basic information on hazard perception and clues for recognition of hazards…*"

[37] **See also:** J. J. Keller. "Hazard Perception." *Entry-Level Driver Training: Obtaining A CDL*, Neenah, Wisconsin, J. J. Keller & Associates, 2019, p. 202. **See also:** Adams, Alice, and PTDI. "Hazard Awareness." *Tractor-Trailer Truck Driver Training*, Fourth Edition, Clifton Park, NY, Delmar Cengage Learning, 2013, pp. 444-459.

b. "***Seeing Hazards Lets You Be Prepared.*** *You will have more time to act if you see hazards before they become emergencies.*"

c. "***Learning to See Hazards.*** *There are often clues to help you see hazards. The more you drive, the better you can learn to see hazards*."

2. Michigan CDL Manual, Section 2.8.3 – Drivers Who Are Hazards.[38]

a. "***Conflicts.*** *You are in conflict when you have to change speed and/or direction to avoid hitting someone. Conflicts occur at intersection where vehicles meet, at merges (such as turnpike on ramps) and where there are needed lane changes (such as the end of a lane, forcing a move to another lane of traffic). Other situations include slow moving or stalled traffic in a traffic lane, and accident scenes. Watch for other drivers who are in conflict because they are a hazard to you. When they react to this conflict, they may do something that will put them in conflict with you.*"

3. Michigan CDL Manual, Section 2.8.4 – Always Have a Plan.[39]

a. "*You should always be looking for hazards. Continue to learn to see hazards on the road. However, don't forget why you are looking for hazards – they may turn into emergencies. You look for hazards in order to have time to plan a way out of any emergency. When you see a hazard, think about the emergencies that could develop and figure out what you would do. Always be prepared to take action based on your plans. In this way, you will be a prepared, defensive driver who will improve your own safety as well as the safety of all road users.*"

[38] Id.
[39] Id.

## V. SUMMARY.

From the information provided to me, and the opinions reached in this report, I conclude the following:

1. Defendant Pastrana-Jimenez was required to have the necessary knowledge, skills, and safe driving attitude to prevent crashing into others as indicated in this report.
2. Defendant Pastrana-Jimenez had a responsibility to apply defensive driving concepts like The Smith System as indicated in this report.
3. Defendant Pastrana-Jimenez had a responsibility to adhere to industry regulations and standards in at least the following ways as indicated in this report:
   a. Responsibility to adequately search his driving environment prior to driving into it;
   b. Responsibility to yield the right-of-way to oncoming traffic;
   c. Responsibility to safely manage space between his vehicle and other road users;
   d. Responsibility to recognize hazards and potential conflicts;
   e. Responsibility to operate with due caution as it relates to accident avoidance.
4. FJ Carrier Logistics is responsible for the actions of Defendant Pastrana-Jimenez as it relates to the safe operation of a CMV.
5. FJ Carrier Logistics is responsible for training and supervising their professional drivers; namely Defendant Pastrana-Jimenez.
6. FJ Carrier Logistics failures related to monitoring, training, and supervising their CMV operators was inconsistent with industry standards and regulations as noted in this report. These failures were a proximate cause of the collision.

***These are the opinions I have as of this date, and I reserve the right to supplement my opinions as new or additional information becomes available to me. These opinions are not intended to be considered legal conclusions. Rather, these opinions, and the methods for reaching them, are consistent with the methods and process by which a truck safety professional such as myself would ordinarily use in conducting an accident investigation and crash preventability determination during the normal scope of business as a motor carrier. These opinions are based on the facts and materials provided to me in this case as identified in Appendix B to this report, as well as the totality of my experience, education, and training; and specifically includes reliance on various peer reviewed sources as referenced in footnotes throughout this report, in conjunction with industry customs and standards as practiced in the trucking industry.***

I, ADAM GRILL, CERTIFY THAT THESE ARE MY OPINIONS ON THIS 3rd DAY OF SEPTEMBER, 2026 REGARDING THE CASE OF JAMES MCDONALD VS FJ CARRIER LOGISTICS LLC, ET AL.

ADAM GRILL